1   WO

7          IN THE UNITED STATES DISTRICT COURT

8            FOR THE DISTRICT OF ARIZONA

10  Dialog4 System Engineering GmbH,     )   No. CV 07-2534-PHX-MHM
                                          )
11            Plaintiff,                  )
                                          )   **ORDER**
12  vs.                                   )
                                          )
13                                        )
    Circuit Research Labs, Inc.; Charles  )
14  Brentlinger; and Tammy Brentlinger,   )
                                          )
15                                        )
              Defendants.                 )
16                                        )
                                          )
17  _____ )

        On August 4, 2009, the Court presided over a bench trial in this case to resolve

issues of fact left to be resolved following the Court's March 31, 2009 order granting in

part and denying in part Plaintiff Dialog4 System Engineering GmbH's ("Dialog4")

Motion for Summary Judgment ("March 31, 2009 order").  Dialog4 was represented by

Brett Dunkelman of Osborn Maledon PA and Defendants Circuit Research Labs, Inc.

("CRL") and Charles Brentlinger ("Brentlinger") were represented by Donald Wall and

Sara Ransom of Squire Sanders & Dempsey LLP.  Berthold Burkhardtsmaier

("Burkhardtsmaier"), Dialog4's Managing Director, and Brentlinger testified during the

bench trial.  After considering the evidence and testimony presented, and having reviewed

the parties' revised proposed findings of fact and conclusions of law, the Court issues the

following order.

# I. FINDINGS OF FACT

1. Dialog4 is a German corporation. (Dkt. #33, §C(1)(a)).

2. Burkhardtsmaier is the Managing Director of Dialog4. (Dkt. #33, §C(1)(a)).

3. CRL is an Arizona corporation. (Dkt. #33, §C(1)(b)).

4. Brentlinger became Chairman and CEO of CRL in September of 1999. (Transcript ("Tr.") at 151).

5. In January of 2002, Dialog4 and CRL entered into an Asset Sale and Purchase Agreement and two Amendments (collectively the "ASPA"), whereby Dialog4 agreed to sell its business assets to CRL in exchange for $2,000,000: $750,000 in cash installments and 1,250,000 shares of CRL's stock ("CRL stock"), then valued at approximately $1.00 per share, which were to be registered by CRL with the Securities and Exchange Commission ("SEC"). (Dkt. #33, §C(1)(c); Trial Exhibit ("Tr. Exh.") 1; Tr. at 53).

6. Dialog4 did not intend to become a long-term shareholder of CRL. (Tr. at 53).

7. On November 16, 2001, Dialog4 and Brentlinger entered into a Stock Purchase Agreement ("SPA"), whereby Brentlinger agreed to purchase the CRL stock from Dialog4 upon written request "at any time beginning twelve months after the purchase date and ending eighteen months after the purchase date." (Dkt. #33, §C(1)(c)). Conversely, Dialog4 agreed to sell the CRL Stock to Brentlinger at a price of $1.10 per share upon written request from Brentlinger within that same time period. (Tr. Exh. 2, ¶ 4).

8. In Fall 2002, disputes arose between Dialog4, Burkhardtsmaier, CRL, and Brentlinger, and CRL ceased making installment payments to Dialog4 as required by the ASPA. (Tr. at 153-55; Tr. Exh. 4, ¶ 17). By that time, CRL had made four installment payments to Dialog4, totaling $152,944.67. (Tr. at 56; Tr. Exh. 4, ¶ 17). CRL had not yet registered the CRL Stock with the SEC as required by the ASPA. (Tr. at 56).

9.　On March 21, 2003, Dialog4 sent a timely written request to Brentlinger that he purchase the CRL Stock from Dialog4 pursuant to the SPA.  (Dkt. #33, §C(1)(e)).  Brentlinger did not respond to the request and did not purchase the CRL Stock.  (Tr. at 57).  Brentlinger thus breached his obligations to Dialog4 under the SPA.  (Dkt. #24).

10.　On March 26, 2003, Dialog4 invoked an arbitration clause contained in the ASPA.  (Tr. Exh. 4, ¶ 10).  An arbitration hearing was conducted in Germany on April 28, 2004, and on October 4, 2004, the sole Arbiter issued an Arbitration Award.  (Dkt. #33, §C(1)(f)).

11.　In February of 2004, Joseph Richardson ("Richardson"), an attorney representing CRL, informed Dialog4 that his law firm could not issue an opinion regarding Dilaog4's proposed sale of CRL Stock because it appeared that Dialog4 was an "affiliate" of CRL under SEC Rule 144(a)(1).  (Tr. Exh. 104).  Richardson indicated that Dialog4 was an affiliate of CRL because "Dialog4 is identified as the beneficial owner of 1,250,000 shares of common stock, or 32.8% of the shares outstanding," in addition to the fact that Burkhardtsmaier was a member of CRL's Board of Directors.  (Id.).

12.　The Arbitration Award, as slightly modified on December 2, 2004, awarded the following: (a) CRL and Brentlinger, jointly and severally, were ordered to pay Dialog4 the sum of $597,055.33, plus 10% interest from August 20, 2002, minus $25,000, for a total of approximately $711,348; (b) CRL and Brentlinger, jointly and severally, were ordered to pay MSC Vertriebs GmbH the sum of 135,000 euros, plus interest at the rate of 8% above the German base interest rate as of May 1, 2004 (the "MSC Obligation"), for a total of approximately $193,640; (c) CRL was ordered to register the CRL Stock with the SEC; and (d) CRL and Brentlinger, jointly and severally, were ordered to pay Dialog4 the sum of 29,567.47 for the costs of the arbitration proceedings and the sum of 77,832.50 euros for Dialog4's attorneys' fees and costs, for a total of approximately $143,970.  (Tr. Exh. 4; Tr. at

58, 59; Dkt. #56, ¶ 136). Accordingly, CRL and Brentlinger's total obligations to Dialog4 under the Arbitration Award, including interest and the MSC Obligation, amounted to approximately $1,048,958.

13. In a May 30, 2008 prospectus of CRL filed with the SEC, CRL represented that after learning of the Arbitration Award on October 8, 2004, CRL "increased its reserves from $712,000, the amount of principle and interest then due under its note payable to Dialog4 to $1,393,000." (Tr. Exh. 29, p.76). CRL also stated that the increase of $681,135 "represent[ed] the amount awarded by the Arbiter on account of Dialog4's costs and fees incurred in connection with the arbitration and the amount of a liability to a third party vendor to Dialog4," presumably referring to the MSC Obligation. (Id.).

14. In February 2005, Dialog4 initiated litigation in the United States District Court for the District of Arizona to confirm and enforce the Arbitration Award. (Dkt. #33, §C(1)(g)).

15. On April 15, 2005, Dialog4, CRL, and Brentlinger entered into a Settlement Agreement and Release ("SAR") to settle the litigation initiated in February 2005 to enforce the Arbitration Award and to resolve an employment dispute between Burkhardtsmaier and CRL. (Tr. Exh. 6). Dialog4, CRL, and Brentlinger also sought to resolve any "additional claims which could be asserted under the ASPA and the [SPA]." (Id., p.2).

16. Paragraph 1 of the SAR provided a complete release by the parties of, among other things, "any claims that arise out of or relate to the ASPA or the [SPA] . . . . presently known or unknown[,]" to become effective upon full payment by CRL and Brentlinger made in accordance with Paragraph 3 of the SAR and the registration of the CRL Stock pursuant to Paragraph 4 of the SAR. (Tr. Exh. 6, pp. 1-2).

17. Paragraph 3 of the SAR required CRL and Brentlinger to pay Dialog4 the sum of $965,000 in two installments. (Tr. Exh. 6, p.4). Both installments have been paid. (Id.; Dkt. #33, §C(1)(i)).

18. Paragraph 5 of the SAR required Dialog4 to pay one-half of the MSC Obligation, which the Arbitration Award had obligated CRL and Brentlinger to pay, out of the $965,000 that CRL and Brentlinger paid to Dialog4 under Paragraph 3 of the SAR. (Tr. Exh. 6, pp. 5-6).

19. Paragraph 6 of the SAR required CRL to pay Burkhardtsmaier 5,400 euros per month for 60 months pursuant to a Court Settlement Agreement. (Tr. Exh. 6, p.6). CRL ceased making payments in March 2009; thirteen installments remain unpaid. (Tr. at 61-62).

20. Paragraph 7 of the SAR required Burkhardtsmaier to tender his resignation as a member of the CRL Board of Directors. (Tr. Exh. 6). He did so in April of 2005. (Tr. Exh. 4; Tr. at 63).

21. Paragraph 8(d) of the SAR provided that "[u]nless and until [CRL and Brentlinger] are in default of their obligations under Paragraph 3 or Paragraph 4 of [the SAR], Dialog4 shall not seek enforcement of the ASPA." (Tr. Exh. 6, p.7). Similarly, Paragraph 8(e) of the SAR provided that "[u]nless and until [CRL and Brentlinger] are in default of any of their obligations under Paragraph 3 or Paragraph 4 of [the SAR], [Dialog4 and Burkhardtsmaier] shall not seek enforcement of the [SPA]." (Id.).

22. Paragraph 4 of the SAR required CRL to (1) "file with the [SEC] a registration statement," (2) "use its best efforts to have such registration statement declared effective as expeditiously as practicable," and (3) "keep such registration statement effective until the earliest of (a) all of the [CRL Stock] [is] sold . . . (b) the [CRL Stock] become freely tradeable under [SEC] Rule 144(k) . . ., or (c) five years from the date the registration statement becomes effective." (Tr. Exh. 6, p.5; Dkt. #33, §C(1)(h)).

23. Pursuant to Paragraph 4 of the SAR, CRL filed a registration statement with the SEC on June 29, 2005, with amendments on November 8 and 9, 2005. (Tr. Exh. 9). In order to maintain registration, CRL had to file quarterly, amended or supplemental materials (referred to as "post-effective amendments") with the SEC. (Dkt. #33, §C(1)(j)).

24. On August 23, 2005, Burkhardtsmaier wrote to his broker, Michael McGuire ("McGuire"), asking him to offer 37,500 shares of the CRL Stock for sale at $1.25. (Tr. Exh. 14). However, Burkhardtsmaier stated that "if [that] asking price [was] too high," McGuire should call him because Dialog4 "want[ed] to sell the shares quickly." (Id.). Burkhardtsmaier also inquired into "how to get the remaining 1,220,000 shares in electronic format in order to put them into the Dialog4 depot." (Id.). McGuire responded that the "stock [was] still restricted and [he] [did] not hold [Dialog4's] shares for 1,220,000[,]" but would "attempt to free [them]." (Id).

25. On September 14, 2005, Burkhardtsmaier wrote to McGuire, informing him that "Dialog4 holds app[roximately] 19% of the shares issued from [CRL]," that Burkhardtsmaier had "resigned from the [CRL Board of Directors] in April 2005" and thus was "no longer an affiliate," and that "CRL [had] filed . . . [a] registration statement with the SEC" on June 29, 2005. (Tr. Exh. 14). Burkhardtsmaier then inquired into why "the shares are still restricted" and "what steps need[ed] to be taken in order for [McGuire] to be in a position to offer the CRL shares for sale in any quantity at any time." (Id.). Burkhardtsmaier continued, "For example: I want to offer 100,000 shares the same day CRL files the next quarterly report. And if the price goes up, I would like to sell another 25,000 the next day. And so on." (Id.).

26. On September 20, 2005, Dialog4 sold 10,000 shares of CRL Stock. (Tr. Exh. 16).

27. On September 21, 2005, Burkhardtsmaier wrote to McGuire, "The first step is taken! Congratulation[s]. Today the stock price went up to $ 1.02. Please offer the next shares for $ 1.0 and sell as much as you can." (Tr. Exh. 14). Dialog4 then

sold 9,714 shares of CRL Stock on September 22, 2005, another 5,000 shares on September 26, 2005, and another 12,286 shares in early October 2005. (Tr. Exh. 16).

28. On October 11, 2005, Burkhardtsmaier wrote to McGuire, expressing concern over "the question of registration in order to sell the shares without limitation due to rule 144," indicating that he believed the CRL Stock was "freely tradeable as soon as the shares [were] registered with the SEC," which occurred on June 29, 2005. (Tr. Exh. 14). Burkhardtsmaier asked McGuire to "have a look and advise [him] what to do in order to . . . sell [the stock] in quantities without limitation." (Id.).

29. On October 20, 2005, Burkhardtsmaier wrote to McGuire, thanking him for selling 37,000 shares of the CRL Stock and noting that there were 7,946,337 shares of CRL Stock outstanding, and that Dialog4 "[could] sell [a] max[imum] [of] 1% of the outstanding shares every 3 month[s], which counts up to app[roximately] 80,000 shares." (Tr. Exh. 14). Burkhardtsmaier instructed McGuire to "keep the sale of the CRL shares rolling." (Id.).

30. Between November 1 and 7, 2005, Dialog4 sold an additional 42,463 shares of the CRL Stock. (Tr. Exh. 16).

31. On November 9, 2005, Burkhardtsmaier forwarded part of CRL's September 11, 2005 registration statement to McGuire and inquired into whether Dialog4 was "still restricted by rule 144 or [whether Dialog4 could] now sell the shares in every quantity at every time." (Tr. Exh. 14).

32. On November 11 and 14, 2005, Dialog4 sold an additional 27,500 shares of CRL Stock. (Tr. Exh. 16). By this time, Dialog4 had sold a total of 106,963 shares of the CRL Stock.

33. On November 15, 2005, Robert McMartin ("McMartin"), CRL's former Chief Financial Office, informed Burkhardtsmaier that he could not sell CRL Stock due to CRL's failure to timely file forms with the SEC. (Tr. Exh. 18, pp. 8-9). The

registration of the CRL Stock became effective on November 22, 2005. (Tr. Exh. 9).

34. On November 23, 2005, Burkhardtsmaier wrote to McGuire, informing him that the CRL Stock was now registered and that Dialog4 could "go on selling the stock . . . but not below USD 1.50 per share," to which McGuire responded, "I suggest you set your sight a little lower[,] maybe around [ ] $1.25 for maybe around 30,000 to 50,000 shares." (Tr. Exh. 14). Burkhardtsmaier replied, "I respect your recommendation to sell up to 50,000 shares for . . . US $1.25. Good luck." (Id.).

35. On March 29, 2006, McMartin informed Burkhardtsmaier that he could not sell any of the CRL Stock after March 31, 2006, until CRL was able to comply with its filing obligations with the SEC. (Tr. Exh. 18, pp. 7-8). CRL did not file a post-effective amendment until July 12, 2006. (Tr. Exh. 9). McMartin sent an email to Burkhardtsmaier on July 25, 2006, stating that he could start selling the CRL Stock again. (Tr. Exh. 18., p.6).

36. Burkhardtsmaier responded to McMartin's July 25, 2006 email within the hour, stating that he would "start to promote the [CRL Stock] and offer them for sale – possibly in one or two blocks." (Tr. Exh. 101).

37. The CRL Stock remained registered through November 14, 2006, after which CRL stopped filing the necessary post-effective amendments with the SEC to maintain registration. (Dkt. #33, §C(1)(j)). CRL then allowed the registration of the CRL stock to lapse in early 2007. CRL did not inform Dialog4 or Burkhardtsmaier of the lapse.

38. Dialog4 did not sell any of the CRL Stock in 2006 (Tr. Exh. 101).

39. On January 25, 2007, Burkhardtsmaier sent an email to McMartin, informing him that Dialog4 wanted "to sell 50,000 or 100,000 shares [of CRL Stock] in one block." (Tr. Exh. 18, p.5).

40. On February 13, 2007, McGuire wrote to Burkhardtsmaier that "the stock – it just does not trade. I suggest if you want $20,000.00 you sell at .23¢ to 25¢ or 80,000 to 100,000 shares." (Tr. Exh. 14).

41. In February 2007, Harman Pro North America, Inc. ("Harman"), whom CRL owed in excess of $2,000,000, offered to sell CRL its note payable and its shares of CRL stock; negotiations ensued. (Tr. Exh. 102). The negotiations lasted approximately six months, Harman ultimately accepted CRL's bid, and the sale was completed on July 13, 2007. (Id.).

42. On March 16, 2007, in an ongoing email exchange, Burkhardtsmaier wrote to McMartin that "[t]he shares are free tradeable and Dialog4 has no relationship to [CRL]." (Tr. Exh. 101).

43. On March 22, 2007, Burkhardtsmaier wrote to McMartin that Dialog4 "still want[ed] to sell the remaining [CRL Stock]. . . . [and] any serious offer [would] be considered." (Tr. Exh. 101).

44. On March 24, 2007, McMartin wrote to Burkhardtsmaier, inquiring into what Dialog4 wanted in exchange for the CRL Stock. (Tr. Exh. 18, p.4). Burkhardtsmaier responded that Dialog4 wanted "to get rid of the shares" and would do so for "the book value, which is app. US 600K[,]" to which McMartin replied, "Sounds interesting." (Id.).

45. On May 21, 2007, McMartin asked Burkhardtsmaier to "take the posting of [his] shares off [his] website" because Burkhardtsmaier was "using stale dated information and there is [a] black out period on [his] shares right now [and] it will not be lifted until we get the post effective amendment finished." (Tr. Exh. 18, p.3). A "blackout period" is "[a] period when a public company's directors, officers, and specified employees can't trade the company's stock. Blackout period occur prior to the release of annual or quarterly financial earnings information, and may extend for a time period after the release of the earnings information. The company, not the [SEC] sets the blackout period." Webster's

New World Finance and Investment Dictionary (Wiley Publ'g, Inc., Indianapolis, IN, 2003).

46.     On June 21, 2007, McMartin again inquired into how much Dialog4 wanted for the CRL Stock. (Tr. Exh. 18, p.2). Burkhardtsmaier responded that Dialog4 "will not sell [the CRL Stock] for less than the book value" or approximately 600,000 euros. Burkhardtsmaier continued that if Dialog4 could not get the book value from CRL, "it [would] have to wait and be patient until the market reaches app. 75 cents." (Id.).

47.     On July 3, 2007, Burkhardtsmaier informed McMartin that Dialog4's "broker [had] already [been] instructed to start selling the [CRL Stock] in quantities as soon as [it reached approximately 75 cents per share], and to offer the shares in one block." (Tr. Exh. 18, p.1). Later that day, McMartin responded via email and informed Burkhardtsmaier that he was "in a black out period and therefore prohibited from selling [the CRL Stock]," to which Burkhardtsmaier replied "[n]o problem. The current share price is not attractive for any sales activities," and then inquired into "the reason for the 'black out period'" and what had "to be done to terminate [it]?" (Tr. Exh. 18). About half an hour later, Burkhardtsmaier wrote another email to McMartin, asking "how [ ] Dialog4 [could] sell its shares to [CRL] in a black out period[,]" and stating that he thought black out periods only applied to officers and employees of CRL. (Id.). McMartin did not respond to Burkhardtsmaier.

48.     On September 1, 2007, Burkhardtsmaier wrote to McGuire, noting that Burkhardtsmaier and McGuire had not been in contact since January 17, 2006, and that "[s]ince [that] date the CRL stock price dropped continuously from $1.00 to $0.25. SHIT . . . . We lost quite some money." (Tr. Exh. 14). Burkhardtsmaier then informed McGuire that Dialog4 would be willing to sell approximately 40,000 shares for 50 cents if possible and inquired into whether McGuire had any

ideas or recommendations on how to "turn the page," presumably meaning, sell the CRL Stock.  (Id.).

49.    On September 19, 2007, Burkhardtsmaier wrote to McGuire, noting that the "value per share [of the CRL Stock] [was] USD 0.54" and instructed him to "sell up to 40,000 shares in one block or in parts for the best price you can get [greater than] USD 0.50."  (Tr. Exh. 14).

50.    On October 1, 2007, Richardson issued Dialog4 an opinion letter, stating that Dialog4 was authorized to sell up to 114,303 shares of the CRL Stock under SEC Rule 144.  (Tr. Exh. 105).  In his opinion letter, Richardson also indicated that the CRL Stock was "restricted."  (Id.).

51.    October 4, 2007, Burkhardtsmaier responded to McGuire, inquiring into why McGuire did not "start selling 40,000 . . . shares [of the CRL Stock]" on September 19, 2007 as Burkhardtsmaier had instructed, and why he was waiting for "approval from an attorney," since Burkhardtsmaier thought the CRL Stock was "registered . . . and [could] be sold in any quantity at any time[.]"  (Tr. Exh. 14).  In response, McGuire forwarded Richardson's opinion letter to Burkhardtsmaier, informing Burkhardtsmaier that based on his reading of the opinion letter, Dialog4 "still need[ed] to file form 144 because [Burkhardtsmaier] was still a control person (more than 10% of the [CRL] stock)."  (Tr. Exh. 14).

52.    On October 10, 2007, Burkhardtsmaier sent an email to Richardson, inquiring into "why [Dialog4] [could not] sell the shares [it] want[ed] . . . . [and] [w]hy [Dialog4] [had] to apply for an opinion, and . . . [could only] sell 114,303 shares," as indicated in Richardson's October 1, 2007 letter.  (Tr. Exh. 7).  Burkhardtsmaier indicated that "[t]o [his] knowledge, CRL [had] filled [sic] a [registration] statement (and is also paying for it) to allowing [sic] DIalog4 to freely trade the CRL shares."  (Id.).

53.    On October 11, 2007, Richardson responded to Burkhardtsmaier's October 10, 2007 email, informing Burkhardtsmaier that "the registration statement [was]

currently not in effect" because CRL had not filed the necessary post-effective amendments with the SEC to keep the registration statement effective. Richardson also stated that "[p]reparing a new up-to-date registration statement [would] cost CRL between $15,000 and $60,000 . . . . [and] take[s] approximately 6 to 8 weeks[.]" (Id.). In addition, Richardson noted that "Dialog4 own[ed] about 1,250,000 shares of CRL common stock, or about 15% of the outstanding shares[,]" and indicated that "[t]he SEC assumes an owner of 10% or more to be an 'affiliate' of an issuer." (Id.). However, Richardson qualified his statement by writing that "[w]hile this assumption can be rebutted, that is not an opinion we have been asked to render nor is it one that we would render," and the "legal issue of whether Dialog4 is not an affiliate of CRL notwithstanding the size of its share ownership is a question to be considered by counsel of Dialog4 and not by counsel to CRL." (Id.).

54. On October 11, 2007, Burkhardtsmaier wrote to McGuire, noting that "there [was] a lot of sales traffic with the CRL stock," and that "Harman sold 1.5 [million] shares plus some credit notes to Mr. Brentlinger Senior (the father of the CRL CEO Jay Brentlinger) for USD 1.5 [million]. The 3[rd] quarter report will look very good – [CRL] is now completely owned by the Brentlinger family." (Tr. Exh. 14). Burkhardtsmaier then instructed McGuire to "sell 40,000 of our shares as discussed," and inquired into whether McGuire had received "the documents to start selling[.]" (Id.). McGuire responded on October 15, 2007, that "[s]tock is back and trying to sell at .50¢ – let me know if you want to do something different[,]" to which Burkhardtsmaier replied, "Sales [greater than] .50¢ are ok." (Id.).

55. On October 17 and 18, 2007, Dialog4 sold 1,000 and 9,000 shares, respectively, of CRL Stock. (Tr. Exh. 16). Dialog4 did not sell any other stock in 2007. (Tr. Exh. 101).

- 12 -

56. On October 19, 2007, Burkhardtsmaier wrote to McGuire, noting that 42,000 shares of stock had been sold at greater than 50 cents between October 16 and 18, 2007, and inquired into "[h]ow much of [that] volume was from [Dialog4's CRL] Stock." (Tr. Exh. 14).

57. There appears to have been only three or four periods of substantial sales activity between 2005 and the present, including (1) in the fourth quarter of 2005, just prior to the registration of the CRL Stock becoming effective; (2) in the second quarter of 2006, during the time period that CRL instructed Dialog3 not to sell any stock because of a blackout period; and (3) in September/October of 2007, when Dialog4 tried to sell CRL Stock only to discover that the stock registration had lapsed.

58. On November 14, 2007, Dialog4 sent CRL and Brentlinger notice that it considered them in default of their obligations under Paragraph 4 of the SAR and stated that "[u]nless CRL immediately resumes performing its obligations under Paragraph 4 and causes the registration to once again become effective within 30 days, Dialog4, at its discretion, will exercise any and all rights it may have under the [SAR] . . . ." (Tr. Exh. 10). CRL and Brentlinger did not respond to Dialog4's letter.

59. Dialog4 filed the instant lawsuit against CRL and Brentlinger on December 14, 2007. (Dkt. #33, §C(1)(k)). In its Complaint, Dialog4 seeks (1) an order "[c]onfirming and enforcing the Arbitration Award in an amount which reflects the sums previously paid by [CRL]"; (2) "an order compelling [CRL] to specifically perform its obligation under Paragraph 4 of the SAR"; (3) "an order compelling Brentlinger to specifically perform his obligations under the SPA to purchase the CRL Stock at $1.10 per share, plus prejudgment interest"; (4) "an award of the attorneys' fees and costs Dialog4 has incurred in this action"; and (5) "such other and further relief as the Court may deem just and appropriate." (Dkt. #1, pp. 5-6).

60. Dialog4 filed its Motion for Partial Summary Judgment in this action on May 30, 2008. (Dkt. #33, §C(1)(k)).

61. On May 30, 2008, CRL filed post-effective amendments to re-register the CRL Stock. (Dkt. #33, §C(1)(l)). CRL continued to file post-effective amendments through November 14, 2008. (Id.). As a result of these filings with the SEC, the CRL Stock was registered from June 6, 2008, until approximately February 14, 2009. (Tr. Exh. 9; Tr. at 171).

62. On March 31, 2009, the Court granted in part and denied in part Dialog4's Motion for Partial Summary Judgment ("March 31, 2009 order"), holding (1) "Brentlinger breached the SPA in 2003 by failing to purchase the CRL stock pursuant to Dialog4's timely March 2003 request"; (2) Defendants breached Paragraph 4 of the SAR by failing to take any steps between early 2007 and May 2008 to keep the CRL stock registered"; and (3) the release and discharge in Paragraph 1 of the SAR has not yet become effective and thus does not bar Dialog4 from seeking to enforce the ASPA and the SPA." The Court was unable to conclude at that time, however, whether "Defendants' breach of Paragraph 4 of the SAR was material." (Dkt. #24, p.16).

63. On June 10, 2009, the Court dismissed with prejudice Defendant Tammy Brentlinger from this case pursuant to the parties' June 10, 2009 stipulation. (Dkt. #39).

## II. CONCLUSIONS OF LAW

### A. SEC Rule 144

CRL and Brentlinger ask this Court to find that "by October 2007, Dialog4 knew, or reasonably should have known, that Dialog4 was no longer an affiliate of CRL" and thus the CRL Stock had become "freely tradeable" under SEC Rule 144, such that CRL and Brentlinger were no longer bound by Paragraph 4(b) of the SAR. (Dkt. #56, p.13 ¶ 71). In other words, CRL and Brentlinger implicitly ask the Court to reconsider its March 31, 2009 order holding that CRL and Brentlinger breached Paragraph 4 of the SAR and

instead hold that the terms of Paragraph 4 were satisfied and the release of Paragraph 1 of the SAR became effective. The Court, however, will not reconsider its March 31, 2009 order.

First, the defense that the CRL Stock had become "freely tradeable" under SEC Rule 144 and thus the release in Paragraph 1 of the SAR had become effective is an affirmative defense. See, e.g., In re Cellular 101, Inc., 539 F.3d 1150, 1155 (9th Cir. 2008) ("[R]elease is an affirmative defense and is generally waived if not asserted in the answer to a complaint.") (citing Fed.R.Civ.P. 8(c)) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . release . . . ."). CRL and Brentlinger did not raise this defense in their Answer to Dialog4's Complaint. (Dkt. #10). Nor did they raise it in response to Dialog4's Motion for Partial Summary Judgment (Dkt. #19), in the parties' Joint Proposed Pretrial Order (Dkt. #33), their Trial Brief (Dkt. #34), or their Proposed Findings of Fact and Conclusions of Law (Dkt. #44). In fact, the first time CRL and Brentlinger raised this defense – the argument that in fact the CRL Stock had become freely tradeable under SEC Rule 144 and thus they had not breached the SAR, but in actuality fulfilled their obligations under Paragraph 4 of the SAR and the release in Paragraph 1 had gone into effect – was during the bench trial on August 4, 2009. Accordingly, not only did CRL and Brentlinger forfeit this defense by not raising it in their Answer, they waived it by raising it for the first time on the day of trial.[1] See United States v. Olano, 507 U.S. 725, 733 (1993) ("Waiver is different from

---

[1]CRL and Brentlinger contend that they "could not reasonably discover that Dialog4 knew that it was no longer an affiliate, and that the CRL shares were [freely tradeable] until after the Court's ruling on Dialog4's motion for partial summary judgment because Dialog4 did not disclose documents containing the pertinent information until April 8, 2009 – a week after the Court's ruling." (Dkt. #56, p.14 ¶ 73). CRL and Brentlinger, however, did not serve Dialog4 with a set of interrogatories or request for production of documents until July 21, 2008, five days after Dialog4's Motion for Partial Summary Judgment had been fully briefed. Furthermore, even if Burkhardtsmaier's September 14, 2005 and October 11, 2007 letters established that he believed Dialog4 was no longer an "affiliate," it is clear from Burkhardtsmaier's other letters during those same time periods that he always believed that registration of the CRL Stock was still necessary in order for Dialog4 to be able to freely

forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (internal quotation marks and citations omitted).

Second, as Richardson stated in his October 11, 2007 email to Burkhardtsmaier, "[t]he SEC assumes an owner of 10% or more to be an 'affiliate' of an issuer." (Tr. Exh. 7). And as CRL and Brentlinger acknowledge, as of October 2007, Dialog4 possessed 1,133,037 shares of CRL Stock out of approximately 8,000,000 shares of CRL Stock, or approximately 14 percent of CRL's outstanding stock at that time. (Dkt. #56, p.13 ¶ 68). Despite CRL and Brentlinger's arguments to the contrary, Dialog4 reasonably relied on the SEC's presumption of their status as an affiliate, not to mention CRL's consistent treatment of the CRL Stock as not freely tradeable and subject to Rule 144's restrictions. Accordingly, even if CRL and Brentlinger had not forfeited and waived their defense that Dialog4 was a non-affiliate and thus the CRL Stock was freely tradeable under Rule 144, the Court concludes that CRL and Brentlinger have not overcome the SEC's rebuttable presumption that Dialog4 was an affiliate because it owned more than 10% of CRL's outstanding stock or proven that Burkhardtsmaier knew it was no longer an affiliate of CRL.

**B.    Breach**

In its March 31, 2009 order, the Court held that CRL breached Paragraph 4 of the SAR by failing to take any steps between early 2007 and May 2008 to keep the CRL stock registered, that the release in Paragraph 1 of the SAR had not become effective and did not bar Dialog4 from seeking to enforce the ASPA and the SPA, and that Brentlinger

---

trade the CRL Stock. (Tr. Exh. 14). Moreover, McMartin, CRL's CFO, consistently treated Dialog4 as an affiliate, informing Burkhardtsmaier several times that he could not sell any CRL stock at various times either because CRL had not timely filed registration documents or because of black out periods. (Tr. Exh. 18). Finally, whether or not Dialog4 was an affiliate based on the number of shares it retained at any given time was well within CRL and Brentlinger's knowledge; the determination of Dialog4's status as an affiliate or non-affiliate did not depend on Dialog4's disclosure of the emails between Burkhardtsmaier and his broker.

breached the SPA in 2003 by failing to purchase the CRL stock pursuant to Dialog4's timely request. The remaining question is whether the breach of Paragraph 4 of the SAR was material.

"Under Arizona law, a material breach occurs when (1) a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions or (2) fails to do something required by the contract which is so important to the contract that the breach defeats the very purpose of the contract." Biltmore Bank of Arizona v. First Nat'l Mortgage Sources, LLC, 2008 WL 564833, at *6 (D. Ariz. 2008) (citation omitted); see Found. Dev. Corp. v. Loehmann's, Inc., 163 Ariz. 438, 445 (1990) ("[T]he breach must be 'material,' 'serious,' or 'substantial.'"). Substantial performance, on the other hand, "is the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract it follows that substantial performance has not been rendered, and further performance by the other party is excused." Id. at *8. Thus, in determining whether a breach is material, courts may look to whether the breaching party substantially performed under the contract.

"[S]ubstantial performance means that one party has performed all that is required by a contract, except for slight deficiencies in performance that can easily be cured." Id. "To determine whether a party has substantially performed his obligations . . ., the court. . . should consider the nature of the promised performance, the purpose of the contract, and the extent to which any deficiencies in performance have defeated that purpose." Id. Courts may also consider whether the breaching party's behavior comports with standards of good faith and fair dealing. Loehmann's, 163 Ariz. at 446. "The burden of proving substantial performance is on the party claiming it." Biltmore Bank, 2008 WL 564833, at *8.

At trial, CRL and Brentlinger did not meet their burden of proving that they substantially performed under the SAR. CRL and Brentlinger contend that their breach of the SAR – the lapse of registration of the CRL Stock – is not material because CRL has substantially performed its obligations under the SAR: they fulfilled their obligation

- 17 -

under Paragraph 3 to pay Dialog4 $965,000; they registered the CRL stock with the SEC pursuant to Paragraph 4; maintained that registration for approximately one year; and then re-registered the CRL Stock on May 30, 2008 and maintained that registration until February 14, 2009. (Dkt. #56, p.23 ¶ 130). To the extent CRL and Brentlinger also contend that they substantially performed because Dialog4 "indicated" at various times "that it did not want to sell its shares for then-current trade value" or that the lapse in registration did not "impact Dialog4," whether CRL and Brentlinger substantially performed the SAR depends on their conduct under the SAR, not Dialog4's conduct. Further, it is disingenuous for CRL and Brentlinger to argue that because Dialog4 did not sell the entire amount of stock it was allowed to sell every three months under Rule 144 somehow evidences that CRL and Brentlinger's failure to maintain registration of the CRL Stock was not material. Selling restricted stock is not as simple as CRL and Brentlinger submit; stock is generally sold in blocks during "windows of opportunity," and the ability to sell depends on the amount of stock being traded and the amount of buyers at any given time. Further challenges were created for Dialog4 when McMartin, CRL's CFO, instructed Dialog4 several times that Dialog4 could not sell the CRL Stock and by the fact that Dialog4 was required to obtain legal opinions pursuant to Rule 144 before selling the CRL Stock due to CRL and Brentlinger's failure to maintain registration. (Tr. at 118-19, 137, 141; Tr. Exh. 18). Regardless, the inquiry into substantial performance is an inquiry into the nature of the promised performance under the SAR, the purpose of the SAR, the extent to which any deficiencies in performance have defeated that purpose, and whether CRL and Brentlinger's behavior comports with the standards of good faith and fair dealing.

There is no dispute that the SAR was entered into by the parties to settle litigation brought by Dialog4 to enforce the Arbitration Award against CRL and Brentlinger. Thus, the primary purpose of the SAR was to settle the parties' disputes over money and the CRL Stock. CRL and Brentlinger benefitted by entering the SAR as opposed to fulfilling the Arbitration Award; they were obligated to pay Dialog4 only $965,000, as opposed to

approximately $1,048,958.  In addition, the SAR provided that Dialog4 would not seek to enforce the SPA against Brentlinger as long as CRL maintained registration of the CRL Stock for five years or until Dialog4 sold the CRL Stock or it became freely tradeable. Further, Dialog4 benefitted by not having to pursue enforcement of the Arbitration Award or the SPA, and Dialog4 was provided a five-year window in which to sell the CRL Stock.

Although CRL's payment of $965,000 to Dialog4 under Paragraph 3 of the SAR satisfied part of the purpose of the SAR, CRL's failure to maintain registration of the CRL Stock for only 20 months out of 60 months defeats the other part of the purpose of the SAR.  CRL and Brentlinger's contentions that Dialog4 was not harmed by the breach of Paragraph 4 because Dialog4 was not prevented from selling any CRL Stock ignores the fact that CRL's failure to maintain registration of the CRL Stock deprives Dialog4 of the benefit of its bargain.  In any event, while the evidence presented at trial established that Dialog4 was not technically prevented from selling more shares than it did at any one time, CRL and Brentlinger's failure to maintain registration of the CRL Stock limited Dialog4's ability to freely trade the CRL Stock  in any amount and at any time under the right circumstances by, among other things, requiring Dialog4 to obtain opinion letters prior to offering the CRL Stock for sale.  In addition, contrary to CRL and Brentlinger's contentions, Dialog4 was harmed by the lapse in registration.  For example, in mid-September 2007, Dialog4 instructed its broker to sell 40,000 shares of the CRL stock for below the market price at that time.  In addition, Burkhardtsmaier testified that Dialog4 would have sold additional shares at that price if the sale of the initial 40,000 shares had been successful.  (Tr. at 86).  Dialog4's efforts, however, were frustrated by the fact that the CRL Stock was not registered and Dialog4 was thus required to obtain opinion letters for each block of shares that it attempted to sell during that time period.  But for that delay, it appears that Dialog4 likely would have sold additional shares of the CRL Stock.

CRL and Brentlinger's failure to maintain registration of the CRL Stock clearly frustrated the purpose of the SAR.[2]

In addition, Richardson's October 11, 2007 communication implied that CRL allowed the registration to lapse because "[p]reparing a new up-to-date registration statement [would] cost CRL between $15,000 and $60,000 . . . . [and] take[s] approximately 6 to 8 weeks[.]" (Id.). Furthermore, CRL and Brentlinger did not inform Dialog4 of their decision to stop preparing registration statements to maintain the registration of the CRL Stock; nor did they respond to Dialog4's November 14, 2007 letter, which provided CRL and Brentlinger an opportunity to cure their breach. That behavior does not comport with the standards of good faith and fair dealing.

For the reasons stated above, the Court finds that CRL and Brentlinger did not substantially perform the SAR. To that end, the Court finds that CRL and Brentlinger's breach of the SAR was material. As previously stated, the materiality inquiry concerns the provisions of the contract, not the non-breaching party's response to the breach. And the materiality of Paragraph 4 of the SAR is evident on its face – it is one of only two provisions in the SAR that constitute consideration for Dialog4's promise to not enforce the Arbitration Award and forgo any other claims against CRL and Brentlinger. The purpose of registering the CRL stock – to allow Dialog4 to freely trade all of its shares, not just 80,000 to 115,000 of its shares every 90 days pursuant to Rule 144's restrictions, at any time it saw fit – was clearly frustrated by the multiple lapses in registration of the CRL Stock. The contention that the lapses in registration amount to a "deviat[ion] from

_____

[2]The fact that Dialog4 did not sell any CRL Stock in 2006 is not as significant as CRL and Brentlinger make it out to be: there appears to have been only one "window of opportunity" in 2006, which occurred during the second quarter, the same time period that CRL instructed Dialog3 not to sell any stock as the result of a blackout period. To the extent CRL and Brentlinger contend that the CRL-Harman transaction should excuse the lapse in registration during this particular time period because the transaction prevented CRL from filing updated registration documents (Tr. at 181-84), CRL and Brentlinger fail to establish why they were unable to file updated registration documents when they regularly filed other documents with the SEC. (Tr. Exh. 9).

the [SAR] in only a trivial or minor way," <u>Biltmore Bank</u>, 2008 WL 564833, at *24-25, is unpersuasive.

This conclusion is supported by the case law. In <u>Loehmann's</u>, the Arizona Supreme Court held that a tenant's two day delay in paying a single common interest charge, which represented an insignificant percentage of the overall rent payable under the tenant's lease, was so trivial a breach of a ten-year commercial lease that it did not support termination of the lease. 163 Ariz. at 446-48. The Supreme Court relied on the facts that the breach was short in length and was immediately cured when called to the attention of the tenant, i.e., it was not willful or persistent. <u>Id.</u> Similarly, in <u>Cracchiolo v. Carlucci</u>, the Arizona Supreme Court held that a breach was not material when a building contractor had completed five out of six tasks he had agreed to perform and nearly completed the sixth task (which cost an insignificant amount to complete). 62 Ariz. 284 (1945).

As stated above, CRL and Brentlinger's repeated breaches of Paragraph 4 of the SAR are a far cry from the insignificant, non-material breaches at issue in <u>Loehmann's</u> and <u>Cracchiolo</u>. CRL and Brentlinger have maintained registration of the CRL Stock for only approximately 20 months out of the promised 60 months; they failed to inform Dialog4 of the breach, despite being fully aware that Dialog4 intended to sell the CRL Stock as soon as possible; they failed to timely cure the breach, despite being provided a reasonable opportunity to cure by Dialog4; they have no intention of curing the breach at this time. (Tr. at 171). Accordingly, for these reasons, among the others discussed above, the Court finds that CRL and Brentlinger's failure maintain registration of the CRL Stock constitutes a material breach.

**B.    Remedy**

As a result of CRL and Brentlinger's breach of the SAR, Dialog4 seeks specific performance of the of the Arbitration Award and SPA pursuant to Paragraphs 8(d) and 8(e) of the SAR.

Specific performance is "an equitable remedy which is extraordinary and dependent upon the sound discretion of the court." Glad Tidings Church of America v. Hinkley, 71 Ariz. 306, 314 (1951). Specific performance is available where: (1) there is a contract; (2) the terms of the contract are certain and fair; (3) the party seeking specific performance did not act inequitably; (4) specific enforcement will not inflict a hardship on the breaching party that outweighs the anticipated benefit to the non-breaching party; and (5) there is no adequate remedy at law. The Power P.E.O., Inc. v. Employees Insurance of Wausau, 201 Ariz. 559, 563 (2002). Here, the SAR obligated CRL and Brentlinger to maintain registration of the CRL Stock, and in the event of CRL and Brentlinger's failure to fulfill that obligation, specifically provided that Dialog4 would enforce the Arbitration Award and SPA. There is no evidence to suggest the terms of the SAR are anything but certain and fair. In addition, there is no evidence that Dialog4, the non-breaching party, acted inequitably.

With respect to the issue of undue hardship, at trial Brentlinger testified that he could not, "to the best of [his] knowledge," purchase the CRL Stock from Dialog4 at this time because his "current financial condition [was] linked entirely to [CRL]," and CRL had allegedly ceased operations and is preparing to file for bankruptcy. (Tr. at 158, 163). The Court, however, does not find that testimony entirely credible. CRL's May 30, 2008 filing with the SEC indicated that the total assets of CRL at that time was over 11 million. (Tr. Exh. 30, Tr. at 179). And although not at issue in this case, it appears that CRL may be doing business as Nabro Able LLC and may have transferred at least some of its assets to that company. (Tr. at 175-180). Thus, the Court cannot conclude that an award of specific performance in this case would inflict undue hardship that would outweigh the benefit to Dialog4.

Further, CRL and Brentlinger's contention that "Dialog4 may be made whole by an award of damages" is undercut by their additional contention that it is difficult to "calculat[e] damages for alleged breach of agreements pertaining to assets such as stock, which are inherently unpredictable . . . ." (Dkt. #56, p.36 ¶ 49). Although CRL and

- 22 -

Brentlinger cite the Court to <u>Clements v. Mueller</u>, 41 F.2d 41 (9th Cir. 1930), and <u>Scully</u> <u>v. US WATS, Inc.</u>, 238 F.3d 497, 510 (3d Cir. 2001), those cases are inapposite. <u>Clements</u> involves a damages remedy for the sale of stock under contracts that required the stock's sale or delivery at a specific time; or the date of the conversion of stock. The SAR did not require sale or delivery of the CRL Stock at a time certain; it was supposed to provide Dialog4 the ability to freely trade its stock whenever it chose to do so over a five-year time period. And <u>Scully</u> involves calculating damages for a breach of contract on the date of *the* breach. Here, not only are there multiple breaches, the breaches do not necessarily correspond with the windows of opportunity in which Dialog4 wanted to sell the CRL Stock. The Court cannot find that Dialog4 has an adequate remedy at law in this case.

Nevertheless, CRL and Brentlinger also argue that it would be "impossible for the Court to order specific performance of the SPA, as Dialog4's March 2003 correspondence demanded that Defendant Brentlinger purchase 1,213,000 shares of CRL stock, but thousands of those shares are now in the hands of unknown third parties." (Dkt. #56, pp. 34-35 ¶ 43). But Dialog4 is not seeking to specifically enforce their March 2003 demand letter. Nor does the SAR provide for specific performance of the demand letter; it allows Dialog4 to enforce the SPA, which requires Brentlinger to purchase "any portion" of the CRL Stock. Despite CRL and Brentlinger's contentions, this case is not akin to <u>Grummel v. Hollenstein</u>, 90 Ariz. 256 (1962), in which specific performance was unavailable where a portion of the land contracted for had been sold to a third party. Specific enforcement of the SPA does not require Brentlinger to purchase all of the CRL Stock, including that now owned by third-parties; it requires Brentlinger to perform his obligations under the SPA. Any other interpretation would render Paragraph 8(e) of the SAR unenforceable.[3]

---

[3]CRL and Brentlinger also argue that Dialog4 failed to mitigate its damages. As failure to mitigate is an affirmative defense, it is CRL and Brentlinger's burden to prove that "mitigation was reasonably possible, but was not reasonably attempted." <u>Norther Ariz. Gas</u>

The Court concludes that the appropriate remedy for CRL and Brentlinger's material breach of the SAR is to specifically enforce the SPA and the Arbitration Award pursuant to Paragraphs 8(d) and 8(e) of the SAR. As a result, Brentlinger must fulfill his obligation under the SPA to purchase Dialog4's CRL Stock at $1.10 per share. As Dialog4 has sold 116,963 shares out of 1.25 million shares of the CRL Stock, it retains 1,133,037 shares of the CRL Stock. Therefore, the amount to be paid by Brentlinger to Dialog4 under the SPA is $1,246,340.70, plus prejudgment interest at a rate of 10% per year. A.R.S. § 44-1201.

In addition, CRL and Brentlinger must pay the amount of the Arbitration Award, plus prejudgment interest at the rate of 10%, less the amounts previously paid under Paragraph 3 of the SAR. However, although it is understandable for Dialog4 to rely on CRL's own filings with the SEC, which represented CRL's liability to Dialog4 under the Arbitration Award to be $1,393,000, the Court agrees with CRL and Brentlinger that the actual amount of the Arbitration Award totaled approximately $1,048,958. (Dkt. #56, pp. 25-26 ¶¶ 136-140). And because Dialog4 itself subtracts the $965,000 paid under Paragraph 3 of the SAR from that Award to determine the amount to be paid under the Award, the Court will do the same. Thus, the amount due under the Arbitration Award is $83,958. The appropriate prejudgment interest under Arizona law, contrary to CRL and Brentlinger's unexplained application of "an average federal interest rate of 3.28%" (Dkt. #56, pp. 25-26 ¶ 139), is 10% per year. A.R.S. § 44-1201 ("Interest on any loan,

---

Serv. Inc. v. Petrolane Transp., Inc., 145 Ariz. 467, 477 (Ariz. App. 1984). CRL and Brentlinger have not met their burden; there is no indication that mitigation was reasonably possible after Dialog4 became aware of the breach of Paragraph 4 of the SAR, as there was no evidence presented that there were potential buyers of the CRL Stock after the breach was discovered by Dialog4. More importantly, it is unclear whether the defense of failure to mitigate applies in this case when Paragraph 4 of the SAR provided Dialog4 with five years of registration rights and Dialog4 was under no obligation to sell the CRL Stock during any specific time period. Moreover, CRL and Brentlinger's arguments concerning Dialog4's alleged failure to mitigate is based on 20/20 hindsight, and "whether a party has acted reasonably under the circumstances is not to be measured by ex post facto wisdom." Id. at 479.

indebtedness, judgment or other obligation shall be at the rate of ten per cent per annum, unless a different rate is contracted for in writing, in which event any rate of interest may be agreed to.").  Therefore, the amount to be paid by CRL and Brentlinger to Dialog4 under the Arbitration Award is $83,958.00, with prejudgment interest at a rate of 10% per year.

**Accordingly,**

**IT IS HEREBY ORDERED** finding that CRL's breach of Paragraph 4 of the SAR is material.

**IT IS FURTHER ORDERED** finding that specific performance of the SPA against Brentlinger and the Arbitration Award against CRL and Brentlinger is warranted.

**IT IS FURTHER ORDERED** finding that the amount to be paid by Brentlinger to Dialog4 under the SPA is $1,246,340.70, plus prejudgment interest at a rate of 10% per year.

**IT IS FURTHER ORDERED** finding that the amount to be paid by CRL and Brentlinger to Dialog4 under the Arbitration Award is $83,958.00, with prejudgment interest at a rate of 10% per year.

**IT IS FURTHER ORDERED** awarding Plaintiff its reasonable attorney's fees and costs.  Plaintiff is directed to file its application for attorney's fees in accordance with LRCiv 54.2.

**IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment accordingly.

DATED this 30[th] day of November, 2009.

Mary H. Murguia
United States District Judge